UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JACQUELINE G. LETSON,           )
                                )
            Plaintiff,          )
                                )
        v.                      )       No.  1:08CV61 ERW
                                )                    (TIA)
MICHAEL ASTRUE, Commissioner    )
of Social Security,             )
                                )
            Defendant.          )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.  All

pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b) for appropriate disposition.

## I.    Procedural History

On July 7, 2005, Claimant filed an application for Disability Insurance Benefits pursuant to

Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 53-62).[1]  In the Disability

Report Adult completed by Claimant and filed in conjunction with the application, Claimant stated

that her disability began on May 22, 2004, due to "[t]wo bulging disc in back, disc replacement in

neck."  (Tr. 98-99).  On initial consideration, the Social Security Administration denied Claimant's

claims for benefits.  (Tr. 40-43).  Claimant requested a hearing before an Administrative Law

Judge ("ALJ").  (Tr. 39).  On September 22, 2006, a hearing was held before an ALJ.  (Tr. 289-

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer
(Docket No. 6/filed July 10, 2008).

318).  Claimant testified and was represented by counsel.  (Id.).  Vocational Expert Jeffrey F.

Magrowski, Ph.D., a certified rehabilitation counselor, also testified at the hearing.  (Tr. 314-17).

Thereafter, on November 9, 2006, the ALJ issued a decision denying Claimant's claims for

benefits.  (Tr. 8-20).  After considering the contentions raised in the memorandum of Claimant's

counsel, the Appeals Council found no basis for changing the ALJ's decision and denied

Claimant's request for review of the ALJ's decision on March 13, 2008.  (Tr. 2-4, 6-7).[2]  The

ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on September 22, 2006

#### 1.  Claimant's Testimony

At the hearing on September 22, 2006, Claimant testified in response to questions posed

by the ALJ and counsel.  (Tr. 289-318).  At the time of the hearing, Claimant was fifty-four years

of age.  (Tr. 294).  Claimant lives in Cardwell, Missouri with her husband.  (Tr. 294).

Claimant testified that she last worked for five days as a factory worker on August 30,

2005 and earned $14.00 an hour.  (Tr. 294-95).  Prior to that date, Claimant worked in that

capacity for thirty three years until April 30, 2005.  (Tr. 294-95).

Claimant testified that she was in a serious automobile accident in May, 2004.  (Tr. 296).

In the accident, Claimant injured her neck and the injury required surgical repair.  (Tr. 296).

---

[2]The undersigned interprets the Appeals Council's statement that the additional evidence did not provide a basis for changing the ALJ's decision a finding that Claimant's summary of his medical history was not material.  *See* Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (whether additional evidence meets criteria is question of law; to be material, evidence must be relevant to claimant's condition for time period for which benefits were denied, and must not merely detail after-acquired conditions or post-decision deterioration of pre-existing condition).

Before the accident, Claimant never had trouble with her neck. (Tr. 311). Claimant had fusion surgery two months after the accident and experienced some relief after the surgery. (Tr. 297, 311). After the surgery, Claimant returned to work for four months in early 2005 but she experienced pain and would have to leave work. (Tr. 296). Claimant testified that she would like to return to work, but she cannot work eight hours a day lifting the rods to make the Monroe shocks. (Tr. 299).

Dr. Asa Crow, her family doctor, has been Claimant's treating physician since childhood. (Tr. 297). Claimant testified that Dr. Crow would be the most knowledgeable doctor regarding her condition. (Tr. 298). Claimant testified that Dr. Crow has indicated that her condition is permanent and will not improve and she cannot work. Claimant cannot lift her arms for too long and cannot move around. (Tr. 298). Claimant testified that Dr. Crow has limited her sitting and/or standing to one hour a day. (Tr. 299). If Claimant stands or sits for more than an hour, her neck starts to hurt. (Tr. 300). Claimant experiences pressure headaches on the right side. Dr. Crow has treated her headaches with pain shots. (Tr. 300). Claimant experiences headaches three times a week lasting six to seven hours and Claimant becomes nauseous and has to lie down. (Tr. 312). Claimant can sit in a chair for one hour, but after that time, Claimant has to get up and move around to alleviate her pain. (Tr. 302). Claimant testified that her neck pain and headaches would prevent her from working an eight-hour day even if she could get up and move around during the day. (Tr. 303, 312).

Claimant experiences headaches every day with some relief provided by pain pills and muscle relaxers. (Tr. 301). The pain pills make Claimant drowsy and cause her to fall asleep. Claimant goes to Dr. Crow for pain shots every two to three weeks. (Tr. 301). Dr. Crow

referred Claimant to Dr. Dr. Eichert for testing. (Tr. 302). On referral to Dr. Natarajan, Claimant learned that her migraine headaches stemmed from the accident. (Tr. 302). After taking her pain medication and muscle relaxers to alleviate her neck pain, Claimant has to lie down. (Tr. 303). Claimant testified that no doctor is considering performing further surgery on her neck or removing the plate in her neck. (Tr. 310). Wearing a neck brace helps with her pain. (Tr. 313). Claimant wears a brace when riding in a vehicle or sometimes around the house. (Tr. 313).

Claimant's husband drove from Cardwell, Missouri to the hearing, approximately 120 miles. (Tr. 303-04). He had to stop twice so that Claimant could walk around because Claimant cannot ride in a car very long because riding in a car causes her neck pain. (Tr. 304). Claimant testified that any vibration or bouncing causes her neck pain. (Tr. 304).

As to her daily activities, Claimant's husband helps her clean around the house, and wash the dishes and her mother helps her with the wash. (Tr. 304). Claimant prepares easy meals during the day and cooks supper at night. (Tr. 305). Claimant cannot sleep through the night. If her neck starts hurting, she takes a pain pill and relaxes in the reclining chair. On a good day, usually four to five days each week, her pain is limited to three to four hours each day. On a bad day, two to three days each week, she cannot do anything. (Tr. 305). Claimant cannot hold her grandchildren because of the heavy lifting required. (Tr. 306). Claimant testified that when she puts her left hand over her left jaw area then supports her hand with her elbow on the table, she experiences some relief from her pain. (Tr. 306).

Claimant testified that she can walk 1/4 of mile and then she would have to sit down. (Tr. 307). Claimant testified that she could not do anything with her hands repetitively. (Tr. 307). Claimant does not have a lot of strength in her hands. (Tr. 308). Claimant experiences radiating

pain shooting down her arms to her neck. (Tr. 308). Claimant testified that in her opinion she could not perform any kind of work on a sustained, eight-hour a day basis. (Tr. 309). Nor could she work a five-day, eight hour week. Claimant testified that her neck pain and the lack of strength in her arms would prevent her from working. (Tr. 309).

### 2. Testimony of Vocational Expert

Vocational Expert Jeffrey F. Magrowski, Ph.D., a certified rehabilitation counselor, testified in response to the ALJ's questions. (Tr. 314). The vocational expert asked Claimant about when she returned to work whether her employer placed her on light duty or whether she returned to the same position. Claimant explained that she returned to the same position without any accommodations. Claimant's job required lifting nuts similar in weight to a gallon of milk. (Tr. 314).

The ALJ asked the vocational expert to assume Claimant to be a credible witness with her pain and discomfort at the level she alleged to be in her testimony, would she be able to sustain any work activity in his opinion? (Tr. 315). The vocational expert noted that with her limitations including the need to lie down and rest, he did not know of any regular, full-time jobs that she could perform.

Next, the ALJ asked the vocational expert to assume the following in the second hypothetical:

> Claimant to be limited as suggested by the state agency in their physical residual functional capacity assessment, .... They felt the Claimant had regained the capacity after her surgery and recuperation to perform light lifting and carrying. They say 20 pounds occasionally, 10 pounds frequent, could sit, stand and walk about six hours each in an eight-hour workday. They didn't find any postural limitations but I would think she would not be able to ever climb ladders, ropes or scaffolding and she would not be able to engage in work where she had to

- 5 -

swivel her head, left-to-right, as in watching a tennis match.  She couldn't do that nor could she bend her neck forward with the chin coming close to the chest and maintain that position for any prolonged period nor could she gaze upward for any prolonged period of time because of aggravation and neck pain.  So she shouldn't work with her arms overhead.  Environmental limitations, none were found by the state agency but I would suggest that she would have to avoid concentrated exposure to extreme cold and vibration to the body.  Even a low density hum that you'd get from a machine that you were operating would have to be avoided.  If I find that to be her limitation, would she be able to return to any of her past work?

(Tr. 315-16).  Dr. Magrowski opined that Claimant might be able to return to her position as it is performed in the national economy, at a light level.  For example, Dr. Magrowski listed jobs such as assembly of small parts or small items with 3,000 such jobs existing in the state and 300,000 jobs in the national economy.  (Tr. 316).  In his experience, the vocational expert agreed with the ALJ's finding that the assembler job just discussed would be described in the Dictionary of Occupational Titles, to be consistent with successful performance and the limitations set forth in the second hypothetical.  (Tr. 317).

### 3.  Forms Completed by Claimant

In the Function Report- Adult dated July 18, 2005, Claimant reported taking care of her husband's meals, cleaning and doing the laundry.  (Tr. 88-89).  Claimant does the grocery shopping once a week.  (Tr. 90).

In the Adult Disability Report dated June 8, 2006, Claimant reported becoming unable to work starting on May 22, 2004, because of her two bulging discs in her back and disc replacement in her neck.  (Tr. 98-105).  Claimant noted that she worked after the time of her injury with no accommodation.  (Tr. 99).  Claimant stopped working on March 31, 2005, after a doctor determined she could not work.  Claimant worked as an assembly factory worker from 1972 through 2005. (Tr. 99).

### III.  Medical Records

Dr. Abcul Bahro completed an echocardiogram on May 21, 2002, to determine whether Claimant would be eligible for a class action settlement as a result of having taken Fen/Phen.  (Tr. 106).

On July 11, 2003, Claimant called Dr. Dwight Williams of Paragould Doctors' Clinic requesting a refill of her Prevacid and Estradiol medications.  (Tr. 232).

In an office visit on October 15, 2003, Claimant reported a headache and a sinus infection. (Tr. 221).  Dr. Williams prescribed Depo-Medrol, Allegra, and Decadron.  (Tr. 222).

On December 5, 2003, Claimant reported sinus pressure and chest cold.  (Tr. 217).  Dr. Williams diagnosed Claimant with conjunctivitis and allergies and prescribed medications.  (Tr. 218).

On January 23, 2004, Claimant called Paragould Doctors' Clinic requesting a prescription refill for her Prevacid and Estradiol medications.  (Tr. 216-17).

In an office visit on February 9, 2004, Claimant reported sinus congestion and nasal drainage.  (Tr. 214).  Dr. Crow diagnosed Claimant with acute sinusitis and treated Claimant with an injection of Lincocin and prescribed Periactin and Amoxicillin.  (Tr. 214-15).

On March 8, 2004, Claimant called Paragould Doctors' Clinic requesting a prescription refill for her Prevacid and Estradiol medications.  (Tr. 212-13).

On May 22, 2004, Claimant received medical treatment in the emergency room at Arkansas Methodist Medical Center for cervical strain after a motor vehicle accident. (Tr. 141-43).  Claimant reported having neck and chest pain.  (Tr. 143).  The radiology report of Claimant's cervical spine revealed normal alignment of cervical vertebral bodies and no fractures

within the cervical vertebral bodies or posterior elements. (Tr. 148).  Dr John Hines prescribed a soft collar and Lortal.  (Tr. 142).

On May 25, 2004, Claimant received follow-up treatment after the accident from Dr. Crow at Paragould Doctors' Clinic.  (Tr. 209).  Claimant complained of neck and back pain after a motor vehicle accident earlier in the week.  (Tr. 210).  Examination revealed neck and back pain.  (Tr. 210).  Dr. Crow treated Claimant by continuing her medication regime, having Claimant wear her neck collar, and prescribing Norflex.  (Tr. 211).  Dr. Crow determined that Claimant should be excused from work from May 25, 2004 through June 1, 2004.  (Tr. 209).  Claimant returned on May 28, 2004, complaining of severe pain in epigastric area of her stomach.  (Tr. 207-08).  Dr. Crow treated Claimant and doubled her Prevacid medication and told Claimant to drink milk. (Tr. 208).

In a follow-up visit on June 1, 2004, Claimant reported continued neck pain after motor vehicle accident.  (Tr. 206).  Examination showed tenderness of neck.  Dr. Crow ordered a MRI of Claimant's cervical spine.  (Tr. 206-07).  Dr. Crow determined that Claimant should be excused from work from June 1 through June 8, 2004.  (Tr. 205).

The cervical spine MRI taken on June 3, 2004 showed disc bulge at C5-6 level centrally, disc desiccation, mild non-discogenic degenerative facet joint changes, and curvature of the cervical spine.  (Tr. 140, 197-98).

After the MRI, Claimant returned to Dr. Crow's office on June 7, 2004 for follow-up treatment.  (Tr. 203).  Claimant reported increased pain in her neck.  Examination revealed tenderness in her neck area.  (Tr. 203).  Dr. Crow referred Claimant to Dr. South and noted that her radiological studies showed a bulging disc.  (Tr. 204).  Dr. Crow prescribed Vicodin for her

pain. (Tr. 204). Dr. Crow wrote a letter excusing Claimant from work from June 7 through June 21, 2004. (Tr. 202). On June 10, 2004, Farra Risinger, a LPN at Paragould Doctors' Clinic, contacted Claimant regarding her scheduled appointment with Dr. Arnautovic, a neurologist at Semmes Murphey Clinic on June 15, 2004. (Tr. 202).

In the initial visit on June 15, 2004, Dr. Kenan Arnautovic's examination showed decreased forearm extension to approximately 3/5 bilaterally and deep tendon reflexes to be two plus throughout. (Tr. 124, 132). Dr. Arnautovic found no Hoffman sign could be elicited and her gait to be unremarkable. A review of Claimant's radiological studies showed a well aligned cervical spine and two disc herniations at C5-6 and C6-7. (Tr. 124). Claimant reported significant neck pain down both upper extremities after a car accident three weeks earlier. (Tr. 132). Dr. Arnautovic decided to order an EMG/NVC study of both upper extremities and have Claimant return for follow-up treatment thereafter. (Tr. 124). In a letter to Dr. Crow regarding Claimant's evaluation, Dr. Arnautovic reported his findings of the examination and noted that an EMG/NCV study of both upper extremities should be performed. (Tr. 201).

In a follow-up visit on July 9, 2004, Dr. Arnautovic noted weakness of both forearm flexion and forearm extension. (Tr. 129).

In the July 13, 2004, preoperative note, the EKG revealed no acute abnormality and normal sinus rhythm. (Tr. 114). The doctor noted that Claimant had a history of Phen fen use and a leaky valve detected when an echocardiogram was performed through her lawyer, but the doctor did not hear any heart murmur during examination on that day and determined that Claimant should be okay to proceed with surgery scheduled in one week. (Tr. 114-15).

During the office visit on July 14, 2004, Dr. Arnautovic noted how Claimant had

experienced severe neck pain going down both upper extremities along the medial aspect since an automobile accident. (Tr. 128). Claimant complained of numbness in her hands with her pain worse in the right arm. Examination showed weakness of forearm flexion approximately 3/5 bilaterally and some forearm extension weakness. A MRI showed two level disc herniation at C5-6 and C6-7. Dr. Arnautovic discussed treatment options with Claimant including physical therapy and pain treatment or a surgical procedure. (Tr. 128).

In the Risks and Benefits executed on July 14, 2004, by Claimant before surgery, Dr. Arnautovic explained that due to the degree of compromise and pressure on the spinal cord, he recommended surgery. (Tr. 126). The MRI of Claimant's cervical spine showed right C5-6 disc herniation. (Tr. 138).

In a letter dated July 16, 2004, Dr. Arnautovic updated Dr. Crow regarding Claimant. (Tr. 195). Dr. Arnautovic found Claimant to have severe neck pain going down both upper extremities along the medical aspect and weakness of forearm flexion approximately 3/5 bilaterally. Dr. Arnautovic diagnosed Claimant with disc herniation at C5-6 and two small disc herniations at C4-5 and C6-7 and confirmed his diagnosis with Dr. Eisenberg. Dr. Arnautovic discussed treatment options with Claimant and Claimant opted for surgical treatment over conservative treatment because her pain had not improved. Dr. Arnautovic reported how he would surgically repair the disc herniation at C5-6. (Tr. 195).

On July 19, 2004, Dr. Arnautovic admitted Claimant to Baptist Memorial Hospital to repair a C5-C6 herniated disc by performing microsurgical discectomy and internal fixation with spinal reconstruction C5-C6. (Tr. 108-09). Dr. Arnautovic noted Claimant's preoperative diagnosis to be C5-C6 cervical herniated disc and noted Claimant to have significant pain and

weakness of forearm flexion and radicular distribution mostly to the right at C5 and C6. (Tr. 111). During surgery, Dr. Arnautovic achieved spinal reconstruction of C5 and C6 and internal fixation of C5-C6. (Tr. 112). At the time of discharge, Dr. Arnautovic restricted Claimant to no pushing or pulling, no heavy lifting, and no driving. (Tr. 109-10).

On September 24, 2004, Claimant reported having a sore throat and earache in a phone call to Paragould Doctors' Clinic. (Tr. 191). Dr. Williams prescribed Zithromax. (Tr. 191).

In the office visit on September 24, 2004, Claimant reported doing well and her pain resolved after C5-6 anterior cervical discectomy. (Tr. 125). X-rays of her cervical spine showed good position of the allograft, plate and screws. Dr. Arnautovic noted how he was pleased with Claimant's recovery and told Claimant that she could take off her collar and return to work. (Tr. 125).

On September 30, 2005, Claimant received treatment at Paragould Doctors' Clinic for sinus drainage and cough. (Tr. 187). Claimant was diagnosed with sinusitis and prescribed antibiotic medications as treatment. (Tr. 188-89).

On January 21, 2005, Claimant returned to Dr. Arnautovic for routine follow-up treatment after surgery. (Tr. 123). Claimant reported doing generally well but experiencing occasional neck pain and arm pain with neck swelling. Claimant explained that her neck pain is in the posterior aspect of the lower neck and is related to her job activities. Examination revealed Claimant's motor strength in her upper extremities to be preserved to 5/5 throughout. Dr. Arnautovic noted Hoffman sign to be negative bilaterally. Dr. Arnautovic recommended physical therapy a couple times a week for a couple of months. Dr. Arnautovic recommended Claimant be evaluated by Dr. Carro, an occupational medical doctor who could assess her residual working

capabilities related to her job. (Tr. 123).

In an office visit on February 11, 2005, Claimant reported nasal congestion, sore throat, and cough. (Tr. 184). Dr. Crow diagnosed Claimant with acute sinusitis and bronchitis and treated Claimant with Lincocin/Decadron injection and prescribed Phenergan syp codeine, Nalex, Penicillin, Decadron, and Lincocin. (Tr. 185).

In an office visit on February 16, 2005, Claimant reported nasal congestion, sore throat, and coughing. (Tr. 182). Dr. Crow found Claimant to have acute bronchitis and in a letter requested Claimant be excused from work from February 14, 2005 through February 19, 2005. (Tr. 181-82). Dr. Crow treated Claimant with a Lincocin/Decadron injection and refilled her Prevacid, Lincocin, and Prevacid medications. (Tr. 183).

On March 28, 2005, Claimant called requesting a refill of her Estradiol medication. (Tr. 179-180).

On March 30, 2005, Claimant reported severe neck pain during an office visit with Dr. Dwight Williams. (Tr. 177). History of disc bulge and disc removal are included as history of present illness. (Tr. 177). Dr. Williams determined that Claimant's neck pain might be from overuse during ten-hour work day. (Tr. 178). Dr. Williams ordered rest and prescribed medications and referred Claimant for treatment at Semmes Murphey Neurologists. Dr. Williams diagnosed Claimant with cervicalgia and prescribed Bextra, Vicodin, Decadron, Estradiol, and Prevacid. (Tr. 178). After the office visit, Dr. Williams wrote a letter excusing Claimant from work due to an illness from March 30, 2005 through April 4, 2005. (Tr. 176).

On April 25, 2005, Claimant returned to Dr. Crow's office for follow-up treatment. (Tr. 172). Claimant reported neck pain. (Tr. 172). Examination showed tenderness in her upper back

and neck. (Tr. 173). Dr. Crow determined to give Claimant two weeks of sick leave and referred her to a neurologist in Semmes Murphey Clinic for treatment. Claimant's medications included Estradiol, Prevacid, and Vicodin. (Tr. 173).

In an office visit on May 3, 2005, Claimant requested Dr. Crow fill out papers on her family leave and refill her pain medication. (Tr. 169). Examination revealed tenderness to her neck, a normal gait, and no acute distress. (Tr. 169-70). Dr. Crow refilled her Vicodin prescription and completed the papers for her family leave. (Tr. 170). Dr. Crow authorized Claimant to be excused from work from May 3, 2005 through June 8, 2005 due to an injury. (Tr. 168).

In the office visit on May 11, 2005, Dr. Arnautovic noted seeing Claimant as follow-up treatment from anterior cervical discectomy and fusion for C5-C6 disc surgery ten months earlier. (Tr. 122). Claimant reported doing reasonably well with occasional neck pain, bilateral arm pain, and swelling around the wound area. Examination revealed Claimant's motor strength in the upper extremities to be 5/5 for flexion/extension of forearm and hand intrinsics. Dr. Arnautovic noted Hoffman sign to be negative bilaterally and her range of motion of her neck to be preserved. (Tr. 122). After reviewing Claimant's x-ray report of Claimant's cervical spine, Dr. Arnautovic found the studies showed good position of the plate, screws and allograft and determined that the fusion had obviously occurred. (Tr. 121-22). Dr. Arnautovic opined that he did not know the cause of Claimant's pain and swelling and ordered a MRI of her cervical spine, a CT scan of her neck, and a sed rate and white blood cell count. (Tr. 122). Dr. Arnautovic noted that Claimant should return to the office once the studies were completed. (Tr. 122).

The May 18, 2005, a CT scan of Claimant's cervical spine revealed mild to moderate

multilevel facet degenerative changes, alignment changes, postoperative changes, and no additional abnormalities identified. (Tr. 136-37, 240-41). The May 25, 2005, cervical spine MRI showed postoperative changes, minimal focal dorsal disc margin irregularity at C4-5, and incomplete evaluation of the parotids with abnormality noted. (Tr. 134-35, 238-39).

On June 1, 2005, Dr. Crow's office attempted to contact Claimant at home regarding the completion of her disability forms. (Tr. 167-68).

In an office visit on June 3, 2005, Claimant returned for a physical. (Tr. 166). Claimant reported chronic neck pain since the motor vehicle accident. (Tr. 166). Examination revealed much tenderness in her neck. (Tr. 167). Dr. Crow authorized a letter indicating that Claimant should be excused from work due to an illness from June 3 through July 3, 2005. (Tr. 165).

On June 3, 2005, Dr. Crow completed a ortho/neuro questionnaire on behalf of Claimant for the Standard Insurance Company to determine whether Claimant's clinical condition is disabling. (Tr. 118-20). Dr. Crow listed cervicalgia as Claimant's primary diagnosis and Raynaud's disease as her secondary diagnosis. (Tr. 118). Dr. Crow noted that Claimant's symptoms include pain and her current range of motion in her neck and back is 0 to 20 degrees. (Tr. 118). Dr. Crow's physical findings included distinct muscle spasm and the findings from diagnostic imaging confirm disease. (Tr. 119). Dr. Crow found that Claimant could temporarily sit, stand, and walk for one hour two days a week. Dr. Crow noted that Claimant cannot lift, carry, or push/pull even occasionally during a work day. (Tr. 119). Dr. Crow indicated that Claimant does not have current treatment and he first treated Claimant on May 3, 2005 and last treated her on June 3, 2005. (Tr. 120). Dr. Crow noted that he expected Claimant's condition to regress at any time and her anticipated return to work date to be unknown. (Tr. 120).

On June 29, 2005, Claimant returned to Dr. Crow's office for re-evaluation of cervicalgia. (Tr. 163). Claimant reported continued neck pain. Examination showed tenderness to her neck. (Tr. 163).

Claimant called requesting a continued leave of absence from work until after her evaluation by Dr. Eichert, a specialist. (Tr. 162). On July 6, 2005, Dr. Crow provided a letter requesting that Claimant be excused from work from July 3, 2005 through August 1, 2005. (Tr. 162).

On July 18, 2005, Dr. Crow authorized a Vicodin prescription for Claimant. (Tr. 161).

On July 26, 2005, on referral by Dr. Crow, Dr. Stephen Eichert of Mid-South Neurosurgery, Inc., examined Claimant. (Tr. 155). Dr. Eichert noted that Claimant had been in an motor vehicle accident on May 22, 2004, and then subsequently required an anterior cervical discectomy and fusion with allograft and segmental fixation with plates and screws on July 19, 2004. Claimant reported the litigation stemming from the accident to be resolved. Although Claimant reported continued neck pain, Dr. Eichert noted that the treatment notes from the operating surgeon do not reflect significant complaint by Claimant during her follow-up treatment after surgery. Claimant reported being able to work only one month since her surgery. Claimant reported taking Lortab, muscle relaxants, Estradiol, and Prevacid. Dr. Eichert reported a review of Claimant's systems to be unremarkable. A review of Claimant's MRI studies showed excellent decompression and an excellent position of plates and screws. The x-rays taken on May 11, 2005, showed evidence of subsidence of the graft and lucency superiorly and inferior to the graft with plates and screws in optimal position. To further evaluate Claimant, Dr. Eichert ordered flexion and extension x-rays of Claimant's cervical spine and a bone scan. Based on the results of

the studies, Dr. Eichert indicated that he would make additional recommendations.  (Tr. 155).

In an office visit on July 27, 2005, Claimant reported continued neck pain.  (Tr. 159).
Examination revealed a normal gait, no acute distress, and tenderness to neck.  (Tr. 159-60).
After the office visit, Dr. Crow authorized Claimant to return to work on August 24, 2005 for no
more than eight hours a day and no more than forty hours a week.  (Tr. 159).

The August 1, 2005 x-ray of Claimant's cervical spine showed no listhesis or other
abnormality.  (Tr. 150).  The whole body bone scan showed mild degenerative uptake in the knees
and shoulders with no clear evidence of any metastatic disease and uptake in the cervical spine to
be normal.  (Tr. 151).

On August 8, 2005, Claimant called Paragould Doctor's Clinic requesting a refill of her
Estradil prescription by Dr. Crow.  (Tr. 158).

In a letter dated August 9, 2005, Dr. Eichert reported to Dr. Crow how he examined
Claimant on that day, and she physically remained unchanged.  (Tr. 154).  Dr. Eichert noted how
her bone scan showed no significant abnormality and no evidence of significant lucency about the
graft or screws.  Dr. Eichert determined that no further treatment to be warranted and released
Claimant from the care of Mid-South Neurosurgery, Inc.  (Tr. 154).

In an office visit on August 22, 2005, Claimant reported continued neck pain to Dr. Crow
and requested returning to work.  (Tr. 287).  Examination revealed tenderness to her neck.  (Tr.
287).  Dr. Crow released Claimant to return to work.  (Tr. 288).  Claimant returned on August
30, 2005, and reported increased neck pain.  (Tr. 285).  Claimant reported attempting to return to
work three times but the pain preventing her from working.  Examination revealed tenderness to
her neck, a normal gait, and no acute distress.  (Tr. 285).  Dr. Crow provided Claimant with a

note stating that she is not able to work due to neck pain and this is a permanent condition. (Tr. 286).

On August 31, 2005, Claimant returned to Dr. Arnautovic one year post surgery. (Tr. 237). Claimant reported doing reasonably well but experiencing occasional neck pain and intermittent swelling. The lateral x-rays of her cervical spine showed good positioning of the plate, screws, and allografts and the MRI showed no evidence of any residual compression of the nerve roots or spinal cord. Dr. Arnautovic could not connect Claimant's neck problems with the fused C5-6 anterior cervical discectomy and ordered a CT scan of her neck to rule out any evidence of infection. Dr. Arnautovic noted that he did not find any need for further neurosurgical treatment. (Tr. 237).

In the Physical Residual Functional Capacity Assessment completed on September 1, 2005, H. Styer, a consultant for Disability Determinations, listed anterior cervical discectomy with fusion as Claimant's primary diagnosis. (Tr. 67-74). The consultant indicated that Claimant can occasionally lift twenty pounds, frequently lift ten pounds, and stand and sit about six hours in an eight-hour workday. (Tr. 68). The consultant noted that Claimant has unlimited capacity to push and/or pull. (Tr. 68). With respect to postural limitations, the consultant determined none to be established. (Tr. 69). The consultant noted that Claimant has no established manipulative, visual, communicative, or environmental limitations. (Tr. 70-71). In support, the consultant cited how Claimant's treating physician released Claimant to work for eight hour work days on August 24, 2005. (Tr. 73).

The CT of the cervical spine taken on September 7, 2005, showed a stable cervical spine unchanged from the May 18, 2005, examination and unremarkable post-operative level with

instrumentation.  (Tr. 236).

In a follow-up visit on September 19, 2005, Claimant complained of continued neck pain. (Tr. 282).  Examination showed tenderness to her neck and no acute distress.  (Tr. 282-83).  Dr. Crow treated Claimant with prescriptions including Norflex, Vicodin, and Estradiol.  (Tr. 283).

On October 3, 2005, Dr. Crow completed a ortho/neuro questionnaire on behalf of Claimant for the Standard Insurance Company to determine whether Claimant's clinical condition is disabling.  (Tr. 246-49).  Dr. Crow listed cervicalgia as Claimant's primary diagnosis and Raynaud's disease as her secondary diagnosis.  (Tr. 246).  Dr. Crow noted that Claimant's symptoms include pain and her current range of motion in her neck and back is 0 to 20 degrees. (Tr. 246).  Dr. Crow's physical findings included distinct muscle spasm and the findings from diagnostic imaging confirm disease.  (Tr. 246-47).  Dr. Crow found that Claimant could temporarily sit, stand, and walk for one hour two days a week.  Dr. Crow noted that Claimant cannot lift, carry, or push/pull even occasionally during a work day.  (Tr. 247).  Dr. Crow indicated that Claimant does not have current treatment and he first treated Claimant on May 3, 2005 and last treated her on September 19, 2005.  (Tr. 248).  Dr. Crow noted that he expected Claimant's condition to regress at any time and her anticipated return to work date to be unknown.  (Tr. 248).  In the Attending Physician's Statement, Dr. Crow noted that he first recommended that Claimant stop working during her last visit on August 30, 2005 and that she may require more surgery.  (Tr. 249).

On October 18, 2005, Claimant reported continued neck pain and an inability to work. (Tr. 280).  Claimant requested a written letter to her insurance company noting her inability to work "because they have refused to give her disability."  (Tr. 280).  Examination revealed much

tenderness to neck and limitation of motion in her neck and no acute distress. (Tr. 280-81). Dr. Crow continued her medication regime as treatment. (Tr. 281).

In an office visit on November 22, 2005, Claimant complained of neck pain and reported how she must wear her collar especially when riding in a motor vehicle because of the bouncing motion. (Tr. 277). Claimant noted that wearing the collar in the house provides her some relief. (Tr. 277). Examination showed tenderness to her neck and no acute distress. Dr. Crow refilled her prescriptions as treatment. (Tr. 277).

On December 22, 2005, Claimant returned to Dr. Crow's office after being treated in the emergency room the night before for chest pain. (Tr. 274). Dr. Crow continued her medication regime and referred Claimant to a cardiologist. (Tr. 275). Dr. Crow also prescribed Cyclobenzaprine for muscle relaxation. (Tr. 275).

In a follow-up visit on January 10, 2006, Claimant complained of developing neck pain now causing her nausea and pain in the back of her head. (Tr. 271). Examination revealed a supple neck, no JVD, and no acute distress. (Tr. 271-72). Dr. Crow treated Claimant with an injection of Stadol/Phenergan and continued her medication regime and prescribed phenergan. (Tr. 272). On February 3, 2006, Claimant reported continued neck pain. (Tr. 268). Examination revealed tenderness to her neck and no acute distress. (Tr. 268-69). Dr. Crow refilled her Estradiol, Prevacid, Vicodin, Norflex, Cyclobenzaprine, Phenergan, and Nalex prescriptions. (Tr. 269). In the next visit on March 21, 2006, Claimant complained of severe neck pain and severe nausea and vomiting. (Tr. 265). Examination revealed much tenderness and spasm of her neck and no acute distress. (Tr. 265). Dr. Crow treated Claimant by giving her an injection of Stadol/Phenergan and continuing her medication regime. (Tr. 266). Claimant returned for re-

evaluation of her neck pain on April 19, 2006. (Tr. 262). Claimant reported headache and neck pain and being disabled due to her difficulty with her neck. (Tr. 262). Examination showed tenderness of her neck and Dr. Crow added Elavil to her medication regime and recommended a MRI if Claimant does not get better in the near future. (Tr. 263). In a follow-up visit on May 1, 2006, Claimant reported continued neck pain with headaches and nausea. (Tr. 260). Dr. Crow noted tenderness of her neck during examination and no acute distress. (Tr. 260). Dr. Crow recommended a MRI and possibly referring Claimant to a neurologist at a later date. (Tr. 261).

On May 25, 2006, Claimant returned to Dr. Arnautovic's office for follow-up treatment. (Tr. 242). Claimant reported experiencing some neck pain and some occipital headaches. Dr. Arnautovic determined to refer Claimant to an outside provider, Dr. Shiva Natarajan a headache specialist, for treatment. (Tr. 242-43).

In an office visit on June 28, 2006, Claimant returned for a recheck of her neck pain and headaches. (Tr. 258). Dr. Crow noted that Claimant had been referred to a headache specialist. (Tr. 258). Dr. Crow's examination showed tenderness to her neck but he provided no treatment and refilled her Estradiol, Prevacid, Vicodin, Cyclobenzaprine, and Elavil medications. (Tr. 259). On August 18, 2006, Claimant complained of continued neck pain and how the headache specialist told her to discontinue Vicodin and start taking Zanaflex and Nortriptyline. (Tr. 255-56). Examination revealed a supple neck with no JVD and no acute distress. (Tr., 256). On August 22, 2006, Claimant reported having a sore throat. (Tr. 253). Dr. Williams prescribed Zovirax. (Tr. 254).

In a follow-up office visit on September 5, 2006, Dr. Shiva Natarajan noted how Claimant has had excellent results taking the medications to control her headaches. (Tr. 234). Claimant

reported continued severe muscle spasms in her neck and the spasms not responding to medications. Examination showed severe tenderness and spasms of neck muscle. Dr. Natarajan continued Claimant on her current medications of Imitrex, Zanaflex, and nortriptyline. If approved by insurance, Dr. Natarajan determined Claimant to be an excellent candidate for Botox injections. (Tr. 234). Dr. Natarajan noted that Claimant's EEG results to be normal. (Tr. 234-35).

On September 9, 2006, Claimant reported abdominal pain to Dr. Crow. (Tr. 250). Dr. Crow diagnosed Claimant with gallbladder disease and treated Claimant with a Lincocin/Decadron injection and prescribed Penicillin V Potassium. (Tr. 251).

In a letter dated September 18, 2006, Dr. Crow outlined Claimant's medical history and treatment after the automobile accident in May 2004. (Tr. 244). Dr. Crow opined "that Ms. Letson is totally and permanently disabled as a result of this accident." (Tr. 244).

In a letter dated October 20, 2006, Dr. Crow once again opined that Claimant is totally and permanently disabled. (Tr. 245).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the disability insured status requirements through the date of the decision. (Tr. 19). Claimant has engaged in substantial gainful activity between October 2004 and March 31, 2005. Claimant has not engaged in substantial gainful activity after March 31, 2005. The ALJ found that the medical evidence establishes that Claimant has the severe impairments of cervical spine, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Claimant's allegations of disabling limitations precluding all substantial gainful activity are not

credible.  (Tr. 19).  Next, the ALJ noted how Claimant performed substantial gainful activity between October 2004 through March 31, 2005.  (Tr. 13).  The ALJ observed that at the hearing Claimant showed no outward signs of pain, distress or discomfort while testifying.  (Tr. 17).

The ALJ found that Claimant has had the residual functional capacity to perform work that involves occasional lifting and carrying of more than twenty pounds, frequent lifting and carrying of more than ten pounds, walking or standing more than six hours in an eight-hour workday, and siting more than six hours in an eight-hour work day.  (Tr. 19).  Claimant should perform no work requiring bending of her neck forward, gazing upward, or performing overhead work.  Further, Claimant cannot work in extreme cold or low humidity or work involving vibrations.  The ALJ determined that Claimant is able to perform her past relevant work as an assembler as it is generally performed in the national economy.  (Tr. 19).

Based on Claimant's residual functional capacity, age, education, training, and past relevant work experience, the ALJ opined that Claimant is not disabled.  (Tr. 18-19).  The ALJ found Claimant is not under a disability. (Tr. 19).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in properly assessing the weight given to the medical evidence. Further the Claimant contends that the ALJ failed to properly assess Claimant's credibility regarding her subjective complaints of constant pain.

A.      Weight Given to Medical Opinions

Claimant contends that the ALJ erred by not giving appropriate weight to Claimant's treating doctor's opinions and restrictions when determining her residual functional capacity. See 20 C.F.R. § 404.1527(d)(2) (2005) (requiring the Commissioner to give controlling weight to the opinion of a treating physician if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence"); Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003). When a treating source's opinion is not controlling, it is weighed by the same factors as any other medical opinion: the examining relationship, the treatment relationship, supporting explanations, consistency, specialization, and other factors. See 20 C.F.R. § 404.527(d)(2), 416.927(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's area of speciality. Id. The Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." Id. Claimant contends that the ALJ should have accorded more weight to the treating doctor's opinions and restrictions inasmuch as this physician was her treating physician.

Dr. Crow, Claimant's treating physician, opined that Claimant is unable to work. Claimant contends that the ALJ failed to give Dr. Crow's opinion controlling weight. Moreover, Claimant contends that there is objective evidence which supports Dr. Crow's medical opinion.

"It is the ALJ's function to resolve conflicts among the various treating physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). The opinions and findings of the claimant's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000). Nonetheless, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical and diagnostic data). When diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). "Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlain, 47 F.3d at 1494.

"A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which

the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Chamberlain, 47 F.3d at 1494.

When considering the weight to be given to the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").

The undersigned finds Claimant's argument flawed inasmuch as the instant medical record does not support her claim of disability. The medical record is devoid of any physician, other than her treating physician, finding Claimant disabled or limited in her ability to function. The medical records show that Claimant's neck problems started in 2004 after an automobile accident, but she returned to work and continued to perform her factory assembly work until March 31, 2005. Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that his suggested impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant left her

job due to lack of transportation, not due to disability).

In the instant case, the ALJ determined to give Dr. Crow's opinions neither controlling weight nor much deference because his opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques.  The ALJ gave good reasons for such determinations, and such reasons are supported by substantial evidence on the record as a whole.  The ALJ noted that Dr. Crow's opinions and examination notes appeared to be based primarily on Claimant's subjective complaints and were not supported by clinical and diagnostic techniques or objective medical evidence.  Where a physician's conclusion appears to rest on a claimant's subjective complaints, the ALJ is permitted to discredit such conclusion.  Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)).  As such, even a treating physician's conclusion may be accorded little weight where it is based heavily on a claimant's subjective complaints and is at odds with the weight of objective evidence.  See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999).   Moreover, the opinion contained in the letters dated September 18 and October 20, 2006, finding Claimant to be permanently and completely disabled is inconsistent with and not supported by his own treatment notes.  The letters are conclusory, not based upon any clinical or laboratory diagnostic techniques, and are not supported by the evidence contained in the record as a whole.  See Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)  (physician's conclusory statement without supporting evidence not amount to substantial evidence of disability); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) (physician's opinion must be supported by medically acceptable clinical or diagnostic data).  Thus, the ALJ did not err in according Dr. Crow's opinions little weight.  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).  Indeed, in his own treatment notes, Dr. Crow never set forth

any functional limitations and made conclusory findings of disability in the letters.

After undergoing C5-6 anterior cervical discectomy with spinal reconstruction and internal fixation in July, 2004, Claimant reported doing well and her pain resolved in her follow-up visit with Dr. Arnautovic on September 24, 2004. Dr. Arnautovic noted how he was pleased with Claimant's recovery and told Claimant that she could take off her collar and return to work. A review of his treatment notes shows that Claimant only reported occasional neck pain and Dr. Arnautovic never found Claimant to have any functional limitations and never made any findings regarding Claimant's condition impacting her ability to work or imposed any work limitations. On August 31, 2005, Claimant returned to Dr. Arnautovic one year post surgery. Claimant reported doing reasonably well but experiencing occasional neck pain and intermittent swelling. The lateral x-rays of her cervical spine showed good positioning of the plate, screws, and allografts and the MRI showed no evidence of any residual compression of the nerve roots or spinal cord. Thereafter, Dr. Eichert treated Claimant, but he never imposed any work limitations or found her condition to be permanent. Indeed, Dr. Eichert reported a review of Claimant's systems to be unremarkable and her MRI studies showed excellent decompression and an excellent position of plates and screws. Dr. Eichert noted that although Claimant reported continued neck pain to Dr. Crow, the treatment notes from the operating surgeon do not reflect significant complaint by Claimant during her follow-up treatment after surgery. The medical records of Claimant's treating doctors do not contain clinical evidence of a disabling condition during the relevant time period or any restrictions imposed by the doctors. Indeed, the record shows that on August 22, 2005, Dr. Crow released Claimant to work but in the following appointment, on August 30, 2005, Dr. Crow found Claimant's condition to be permanent without

any testing in support of his determination.  See Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th

Cir. 2000) (holding that an ALJ may discount a treating physician's opinion where the physician

has offered inconsistent opinions).  In any case, whether there is work which Claimant can

perform is an issue reserved for the Commissioner and not Dr. Crow to decide.  See Ellis, 392

F.3d at 994.

    As noted by the ALJ, the objective medical evidence does not support Claimant's alleged

functional limitations.  Nor do the medical records show that Dr. Arnautovic found that Claimant

suffered increased impairments or limitations.  By August 31, 2005, he discharged Claimant from

his treatment inasmuch as he found no reason for additional neurologic treatment.   The treatment

notes show Claimant's condition to be stable, numerous examinations and studies showing

unremarkable results, and the plates and screws to be in good position without any evidence of

loosening.  The ALJ gave good reasons for his determinations, and such reasons are supported by

substantial evidence on the record as a whole.  Thus, the substantial evidence on the whole record

supports the ALJ's findings.

    As stated, the substantial evidence on the record as a whole  supports the ALJ's decision.

Where substantial evidence supports the Commissioner's decision, the decision may not be

reversed merely because substantial evidence may support a different outcome.  Woolf, 3 F.3d at

1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

    Finally, the undersigned notes that where there are conflicts in the evidence, the resolution

of such conflicts is for the Commissioner, and not the Court, to make.  Cantrell v. Apfel, 231 F.3d

1104, 1107 (8th Cir. 2000).  This is even so when the medical evidence is in conflict.  Id.  In the

instant cause, the ALJ gave good reasons to discount the disability assessments rendered by Dr.

Crow inasmuch as his opinions were not supported by substantial medical evidence on the record as a whole. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf, 3 F.3d at 1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

B.    Credibility Determination

The determination of Claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit Claimant's complaints of pain solely because they are unsupported by objective medical evidence. O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must also consider in assessing a claimant's credibility all of the evidence relating to: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski, 739 F.2d at 1322. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ may disbelieve the claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need not explicitly discuss each factor, however. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id. (quoting Strongson, 361

F.3d at 1072). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Homstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001).

The undersigned recognizes that pain itself may be disabling. See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994). However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826. "[T]he real issue is how severe the pain is." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)). While there is no doubt that claimant experiences pain, the more important question is how severe the pain is. Gowell, 242 F.3d at 796.

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, his decision should be upheld. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1966). The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v.

Apfel, 226 F.3d 969, 972 (8th Cir. 2000); see also Brown, 87 F.3d at 966. The ALJ's credibility findings are entitled to deference if the findings are supported by multiple valid reasons. See Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005); Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating Claimant's subjective complaints of functional limitations, the lack of aggressive medical treatment, and the testimony adduced at the hearing. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician, other than Dr. Crow, found that Claimant was disabled or unable to work during the relevant time period. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical

conclusion that claimant is disabled or unable to work); <u>Edwards v. Secretary of Health & Human Servs.</u>, 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).  The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints.  <u>See</u> <u>Stephens v. Shalala</u>, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations.  <u>Hensley v. Barnhart</u>, 352 F.3d 353, 357 (8th Cir. 2003). Likewise, the medical evidence is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment although Claimant testified otherwise at the hearing.  <u>See</u> <u>Id.</u>; <u>Ply v. Massanari</u>, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).  After undergoing a discectomy and internal fixation with spinal reconstruction C5-C6  in July, 2004, Claimant's functional use of her cervical spine had been restored.  <u>Schultz v. Astrue</u>, 479 F.3d 979, 983 (8th Cir. 2007) (noting that if impairment can be controlled by treatment, it cannot be considered disabling); <u>see</u> <u>also</u> <u>Brown v. Barnhart</u>, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").  Further, the medical records show that Claimant's neck problems started in 2004 after an automobile accident, but she returned to work

in October 2004 and continued to perform her factory assembly work until March 31, 2005.[3] Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work. *See* Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

Claimant also testified at the hearing that she has to lie down throughout the day, but there is no objective medical evidence substantiating Claimant's need to lie down. See Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). Further, the record shows Claimant never reported to any doctors her need to lie down during the day. Likewise, no doctor determined Claimant needed to lie down throughout the day as a medical necessity. Thus, if Claimant was not laying down throughout the day out of medical necessity, she must be doing so out of choice. See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf. Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). Further, the ALJ noted how by her own admission, Claimant is able to engage in a fair range of household chores and activities. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("The ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence."); See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding that activities such as driving,

---

[3]In the treatment note dated June 26, 2005, Claimant reported to Dr. Eichert that she had been able to work for one month after the surgery. The record before the undersigned refutes this assertion. Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).

shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain).

Further, the ALJ noted that Claimant showed no outward signs of pain, distress, or discomfort while testifying at the hearing. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (appropriate for ALJ to consider personal observations made during hearing when determining credibility of claimant). Case law permits the ALJ's reasonable inferences. See Pearsall v. Massanari, 274 F.3d 1218. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Id. at 1218 (citation omitted). These observations are supported by substantial evidence on the record as a whole.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (holding that where adequately supported, credibility findings are for the ALJ to make); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for

finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. <u>See</u> <u>Leckenby v. Astrue</u>, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. <u>See</u> <u>Guilliams</u>, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included Claimant's minimal ongoing medical treatment, her lack of functional restrictions by any physicians, her daily activities, lack of objective medical evidence, her ability to work after the alleged onset of disability, and the hearing testimony. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. <u>See</u> <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. <u>See</u> <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that Claimant's complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal the questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this   29th    day of July, 2009.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE